**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL SCOTT STRADER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 2:19-cv-00045** |
| | ) | |
| **CUMBERLAND COUNTY, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Michael Scott Strader, an inmate of the Tennessee Department of Correction who was housed as a pretrial detainee at the Cumberland County Justice Center (CCJC) at the time of the events in this action, has filed a pro se complaint under 42 U.S.C. § 1983 (Doc. No. 1) and an application to proceed in forma pauperis (IFP). (Doc. No. 2.) He has also filed a Motion for Preliminary Injunction (Doc. No. 3) and a Motion to Appoint Counsel. (Doc. No. 8.)

**I. Application to Proceed IFP**

Under the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 1915(a), a prisoner bringing a civil action may apply for permission to file suit without prepaying the filing fee of $350.00 required by 28 U.S.C. § 1914(a). Because it is apparent from Plaintiff's IFP application that he lacks the funds to pay the entire filing fee in advance, his application (Doc. No. 2) will be granted by Order entered contemporaneously herewith.

## II. Initial Review of the Complaint

### A. PLRA Screening Standard

Pursuant to 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss any IFP complaint that is facially frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. Similarly, 28 U.S.C. § 1915A provides that the Court shall conduct an initial review of any prisoner complaint against a governmental entity, officer, or employee, and shall dismiss the complaint or any portion thereof if the defects listed in Section 1915(e)(2)(B) are identified. Under both statutes, this initial review of whether the complaint states a claim upon which relief may be granted asks whether it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," such that it would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Hill v. Lappin, 630 F.3d 468, 470–71 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Applying this standard, the Court must view the complaint in the light most favorable to Plaintiff and take all well-pleaded factual allegations as true. Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citing Gunasekera v. Irwin, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). Furthermore, pro se pleadings must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). However, pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure, Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989), nor can the Court "create a claim

which [a plaintiff] has not spelled out in his pleading." Brown v. Matauszak, 415 F. App'x 608, 613 (6th Cir. 2011) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975)).

**B. Section 1983 Standard**

Plaintiff seeks to vindicate alleged violations of his federal constitutional rights under 42 U.S.C. § 1983. Section 1983 creates a cause of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a Section 1983 claim, Plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was caused by a person acting under color of state law. Carl v. Muskegon Cty., 763 F.3d 592, 595 (6th Cir. 2014).

**C. Allegations and Claims**

 The complaint states that Plaintiff is a convicted inmate incarcerated at the Northeast Correctional Complex in Mountain City, Tennessee, but "was [a] pretrial detainee at the time events occurred" at the CCJC. (Doc. No. 1 at 1.) His allegations concern three categories of events during his incarceration at the CCJC: (1) his September 18, 2018 beating at the hands of a fellow inmate, for which he sues "Cumberland County, Sheriff Casey Cox, Captain Tim Clafin, Lt. Mike Hassler, Sgt. J.R. Hamby, Sgt. Robbie Christmas, as well as guards Charlie Dixon, Aaron Hamby, Mike Hamby, Justin Hurley, and Chris West" for failure to protect (Doc. No. 1 at 12–13); (2) inadequate medical treatment he received for injuries related to this attack, as well as for other medical issues, for which he sues Quality Corrections Health Care (QCHC), "Jane Doe jail doctor, Jane Doe jail nurse #1, Jane Doe jail nurse #2, nurse Gabby Starnes, and nurse Jeff Shelton" (id. at 16, 27), as well as Claflin, Hassler, J.R. Hamby, and Christmas, for deliberate indifference to

serious medical needs; and, (3) retaliatory denial of acceptable conditions of confinement—including denial of recreation time, ability to practice his religion, use of a shower, telephone privileges, ability to clean his cell, use of the prison library, privacy with respect to his legal mail, as well as relief arising from being housed in a pod with an inmate who would routinely defecate and urinate on himself—by guards Charlie Dixon, Mike Hamby, Aaron Hamby, Chris West, and Justin Hurley. (Id. at 19–26.)

Plaintiff alleges that, upon his booking into the CCJC on September 6, 2018, he was housed with an inmate named Abston. (Id. at 9.) Abston appeared to be unstable, and Plaintiff began complaining to multiple prison guards that Abston was having "fits of rage"; expressing aggression towards police, himself, and Plaintiff; and claiming that he could "see & talk to good & evil spirits as well as God." (Id. at 9–10.) Plaintiff complained to the guards that he needed to be moved away from Abston, who was attempting to extort money and commissary items from him and acting in a threatening manner towards him. (Id. at 10.) He also "repeatedly and continuously tried to speak with the administration" about his concern with Abston and his need to be moved, both by communicating through the guards "and in written requests on the inmate kiosk directly to" Lt. Hassler, Cap. Claflin, and Sheriff Cox. (Id.) The guards told Plaintiff that the facility was overcrowded and there was nowhere to move him, so he needed to "do the best [he] could to get along with Mr. Abston or any other inmate for that matter." (Id. at 11.) Plaintiff alleges that the guards knew that Abston had been charged with aggravated assault and aggravated animal cruelty, and that he was a mental health patient. (Id.)

On September 18, 2018, Plaintiff was attacked and severely beaten by Abston in their cell, resulting in serious injuries. (Id. at 11–12.) He alleges that Sheriff Cox, Capt. Claflin, Lt. Hassler, Sgt. J.R. Hamby, Sgt. Christmas, and Officers Dixon, Aaron Hamby, Mike Hamby, Hurley, and

West, failed to protect him pursuant to a CCJC policy or protocol of "refus[ing] to move inmates unless they absolutely have to or are forced to for some reason[.]" (Id. at 12.)

Plaintiff was taken to the CCJC clinic after the attack, and was given "Ibu 800" for his pain and told to lie down and rest. (Id. at 13.) He subsequently attempted to blow his nose and felt his right eye move in its socket, causing him to scream out in pain. He was then taken to the Cumberland County Hospital emergency room, where he received pain medication, a CT scan, and multiple x-rays. (Id.) Plaintiff was diagnosed with a broken eye socket, a broken sinus cavity, and a fractured rib. (Id.) The emergency room physician discharged Plaintiff to return to the CCJC, with a referral to see Dr. Stanley Bise. (Id.)

Plaintiff did not have his injured wrist x-rayed at the hospital. So when he returned to the CCJC, he was told by "Jane Doe jail doctor, Jane Doe jail nurse #1, nurse Gabby Starnes, and nurse Jeff Shelton" that it could only be treated with ibuprofen and an ice pack, despite its "swollen & obvious appearance of dislocation." (Id. at 14.) He was also told that the medications that had been prescribed by the emergency room doctor would not be provided for him at the CCJC. (Id.) He alleges that the CCJC and "the new medical provider Q.C.H.C. were not going to pay for the medications" because they were "trying to save Cumberland County money" by eliminating spending on medications that were not necessary. (Id.) Plaintiff was told that if he wanted those prescriptions filled, he or his family would have to pay for it. (Id.) Plaintiff "strongly disagreed & objected to the treatment [he] was getting," but Capt. Claflin and Lt. Hassler told Plaintiff that "inmates were costing Cumberland County too much money by coming to jail and expecting the county to take care of them, and that C.C.J.C. was not a day care or a Holiday Inn." (Id. at 15.) Plaintiff complained to Claflin, Hassler, J.R. Hamby, and Christmas about his wrist injury, and was told to take his concern to the medical department. (Id. at 14–15.)

From the day that he returned from the hospital following the attack on September 18, 2018, until "sometime in the first two weeks of October 2018," Plaintiff remained at the CCJC. (Id.) But "[s]oon afterwards," he was sent to Dr. Bise, who referred him to a neurologist and an eye specialist, and ordered multiple MRIs to fully examine his head, eyes, neck, and left wrist. (Id.)

The medical staff at the CCJC refused to send Plaintiff for the examinations that Dr. Bise gave referrals for, citing cost concerns. (Id. at 17.) Plaintiff put in another sick call request and was seen by the nursing staff before being put through to the jail doctor. (Id. at 16.) Plaintiff alleges the following interaction with these providers:

> I again informed the Jane Doe jail doctor, as well as the other medical staff/nurses that were present about all of the pain & symptoms I was currently and had been suffering . . . from my head, eyes, neck, and my left wrist. I stated that I believed my left wrist was in fact broke, and had been allowed/was being allowed to heal back incorrectly & out of place! I also stated that I believed something was seriously wrong with my eyes & my head due to the pain and symptoms I was experiencing/had been experiencing since [the attack]. I advised the entire medical staff-including but not limited to: Jane Doe jail doctor, Jane Doe jail nurse #1, Jane Doe jail nurse #2, nurse Gabby Starnes, and nurse Jeff Shelton on numerous occasions & at different times about all of the medical issues & concerns I had, the pain as well as the symptoms, especially about the spots & lines that were obstructing my field of vision/eye sight, the acute and sometimes debilitating pains and the pressure in my head & the excruciating & debilitating pain in my wrist. [These individuals] told me (on numerous occasions & at different times) that the Cumberland County Hospital's E.R. doctor had cleared me at the hospital and that "on paper" I was fine.

(Id.)

Plaintiff further alleges that he complained of chipped and broken teeth suffered in the attack by Abston, but that nurses Shelton, Starnes, and Jane Doe jail nurse #1 refused to send him for dental treatment on the basis that "there was no dental plan at C.C.J.C." (Id. at 18.) Plaintiff was told by the jail doctor that "there w[ere] new policies put into place by Sheriff Casey Cox & Captain Tim Claflin that were supposed to ensure that C.C.J.C. & Q.C.H.C. could and would save

Cumberland County a vast amount of money. Per Sheriff Cox & Captain Claflin, if an inmate wasn't sentenced, and/or the issue wasn't life threatening . . ., then the inmate had to either wait to be released, wait to be sent to prison, or have their family pay up front for any dental/medical treatment if the inmate couldn't pay him/herself." (Id. at 17.)

Plaintiff alleges that in the wake of his attack by Abston, he was approached by Sgt. Christmas with an offer to avoid a disciplinary write-up for fighting if he accepted a five-day lockdown and a two-week loss of visiting and commissary privileges. (Id. at 19.) Plaintiff refused this deal, stating that he had not fought Abston but had been the victim of a one-sided attack. (Id.) He was thereafter served with a disciplinary write-up and was denied phone, library, church, and commissary privileges for three weeks while he remained on lockdown status in a cell in the intake area. (Id. at 19–21.) Plaintiff never received a hearing on the disciplinary charge. (Id. at 21.)

In mid-October, Plaintiff was moved back to the men's housing pod but remained on lockdown status. (Id. at 22.) Purportedly because he was classified as a "medical" inmate, he lost privileges of recreation time, library, and church services. He was denied shower time, sometimes for days at a time. He was denied the necessary supplies to clean and sanitize his cell, and also experienced problems with incoming personal and legal mail not being delivered to him, or being delivered to him already opened. These mail issues were explained to Plaintiff as resulting from new guards not knowing proper procedures. Plaintiff further alleges that jail staff refused to clean up regularly after an inmate in his pod who soiled himself on a daily basis, resulting in an offensive smell in the pod. Plaintiff states that he "wrote several & multiple times to Lt. Hassler and Captain Claflin about the . . . loss of all [his] privileges," but that they responded by deferring to the guards that ran the men's housing unit. (Id. at 25.) These deprivations occurred during the period between mid-October and November 22, 2018. (Id. at 22–26.)

Plaintiff alleges that this period of denial of privileges in the men's housing unit corresponds with his complaints of mistreatment to family members on the limited phone calls he was allowed, and his attempts "to reach out . . . to attorneys." (Id. at 21–22, 24.) He alleges being told that the opening of his legal mail outside of his presence was an accident that would not be repeated, but that it continued to happen even though it "had never been an issue before [he] started to contact attorneys" about the conditions being imposed upon him. (Id. at 24.)

Also during this period, Plaintiff alleges that he sought medical attention for symptoms of a sexually transmitted disease (STD), but was told to drink more water and report back if his symptoms still persisted in a week. (Id. at 27.) The jail medical providers refused to give him an STD test unless he paid for it, and when he was subsequently transported to the county health department, he tested positive for an STD. (Id.) He alleges that he was unnecessarily made to suffer from STD symptoms for "at least a couple months." (Id.)

In addition to suing Cumberland County and the jail medical provider QCHC, Plaintiff sues the individual Defendants in both their individual and official capacities, seeking injunctive relief and damages. He asks the Court to issue injunctive orders for Cumberland County, QCHC, Cox, and Claflin to arrange and pay for the medical treatment he needs; for Cox and other CCJC officer to put new policies and protocols into place that better protect inmates from violence and ensure that all inmates receive proper medical, dental, and mental health care; and for the county and CCJC officers to create a medical pod so that inmates with medical restrictions enjoy the same privileges as other inmates. (Id. at 28–31.)

The complaint also seeks compensatory and/or punitive damages in varying amounts against each of the Defendants, including Plaintiff's attacker, Abston. (Id. at 31–33.) Plaintiff

claims that the Defendants were deliberately indifferent to his safety and to his serious medical needs, and that they deprived him of his First Amendment right to practice his religion. (Id. at 9.)

### D. Analysis

#### 1. Proper Defendants

Because Plaintiff has sued Cumberland County and QCHC—the municipal and corporate entities that employ the individual Defendants—the official-capacity claims against the individual Defendants are subject to dismissal. Such claims "are, in all respects other than name, to be treated as a suit against the entity." Foster v. Michigan, 573 F. App'x 377, 390 (6th Cir. 2014) (quoting Kentucky v. Graham, 473 U.S. 159, 165 (1985)). Where, as here, the entity is a named Defendant, official-capacity claims against the individual employees are properly dismissed as redundant. Epperson v. City of Humboldt, Tenn., 140 F. Supp. 3d 676, 683 (W.D. Tenn. 2015); Horn v. City of Covington, No. 14–73–DLB–CJS, 2015 WL 4042154, at *3 (E.D. Ky. July 1, 2015) ("Suing a municipal officer in his official capacity for a constitutional violation pursuant to 42 U.S.C. § 1983 is the same as suing the municipality itself; [t]herefore, when a plaintiff brings § 1983 claims against a municipal entity and a municipal official in his official capacity, courts will dismiss the official-capacity claims as duplicative.").

QCHC is a proper Defendant under Section 1983 because it contracts with Cumberland County to provide medical services, a function traditionally reserved to the state. See Hicks v. Frey, 992 F.2d 1450, 1458 (6th Cir. 1993) (citing West v. Atkins, 487 U.S. 42, 54 (1988)) ("It is clear that a private entity which contracts with the state to perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting 'under color of state law.'"), abrogated on other grounds by Farmer v. Brennan, 511 U.S. 825 , 835 (1994). Section 1983 claims against such entities are analyzed under the same rubric as claims against

municipalities, by inquiring whether the entity may properly be held liable because its policy caused the alleged deprivation of rights. <u>Starcher v. Corr. Med. Sys., Inc.</u>, 7 F. App'x 459, 465 (6th Cir. 2001).

Abston is not a proper defendant under Section 1983, because he is not a state actor. <u>Schibik v. Hill</u>, No. 3:18-cv-00413, 2018 WL 6528129, at *4 (M.D. Tenn. Dec. 12, 2018) (citing <u>Lewis v. McClennan</u>, 7 F. App'x 373, 375 (6th Cir. 2001) (dismissing § 1983 claim against fellow inmates because "the complaint does not allege that [fellow inmates] were operating as state actors at the time they assaulted the plaintiff"). Plaintiff's claim for damages against Abston will therefore be dismissed.

### 2. Claims for Injunctive Relief

Plaintiff is not entitled to the injunctive relief he seeks. "Clearly, injunctive relief may be ordered by the courts when necessary to remedy prison conditions fostering unconstitutional threats of harm to inmates." <u>Wilson v. Yaklich</u>, 148 F.3d 596, 601 (6th Cir. 1998). However, the complaint in this case—filed after Plaintiff had already been transferred from CCJC to a Tennessee Department of Correction facility (<u>see</u> Doc. No. 1 at 1)—"cannot be read to allege an ongoing constitutional violation by these defendants because [Plaintiff] is no longer incarcerated at [CCJC], where the events that form the basis for his allegations in this case took place." <u>Id.</u> Therefore, to the extent that Plaintiff's requests for injunctive relief could be construed as alleging any continuing impact on Plaintiff from CCJC policies and procedures, such claims were rendered moot by his transfer away from CCJC. <u>Colvin v. Caruso</u>, 605 F.3d 282, 289 (6th Cir. 2010).

To the extent that Plaintiff seeks an order enjoining CCJC to change its policies and procedures for the benefit of current and future CCJC inmates, he lacks standing to pursue such relief. "Standing doctrine functions to ensure, among other things, that the scarce resources of the

federal courts are devoted to those disputes in which the parties have a concrete stake." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 191 (2000). From the time he filed his complaint, Plaintiff has lacked a concrete stake in the future execution of CCJC policies and procedures. He therefore lacks standing to pursue claims enjoining their change. See id. (finding that inmate requesting injunction concerning conditions of confinement "would have lacked initial standing had she filed the complaint after [her] transfer" to a different prison).

Furthermore, Plaintiff is not entitled to an injunction requiring county officials to arrange and pay for his treatment by private doctors outside of the state prison system. Plaintiff is an inmate in the custody of the Tennessee Department of Correction (TDOC), a state agency, and the burden of providing for his future medical care cannot be shifted back to Cumberland County because he was injured while in county custody. "[T]he responsible government or governmental agency" has the obligation to provide treatment "to pretrial detainees or to other persons in its care who require medical attention." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). Since before the complaint was filed, TDOC has been the governmental agency responsible for providing medical care to Plaintiff. He therefore fails to state a viable claim upon which the Court could grant injunctive relief against Cumberland County. See Wilson, 148 F.3d at 601 (in light of prison transfer, there is no "ongoing constitutional violation by these defendants," and the claim for injunctive relief is therefore unavailing).

Because Plaintiff's Motion for Preliminary Injunction (Doc. No. 3) seeks the same relief discussed above—i.e., for Defendants to "arrange and pay for" Plaintiff's medical care by physicians unaffiliated with CCJC or TDOC—it will be denied by separate Order.

### 3. Claims for Damages

#### a. Failure to Protect

Plaintiff seeks damages against Cumberland County, Sheriff Casey Cox, Captain Tim Clafin, Lt. Mike Hassler, Sgt. J.R. Hamby, and Sgt. Robbie Christmas, as well as guards Charlie Dixon, Aaron Hamby, Mike Hamby, Justin Hurley, and Chris West, because they failed to protect him from harm at the hands of Abston. The Due Process Clause of the Fourteenth Amendment protects pretrial detainees "from violence at the hands of other prisoners," in much the same way that the Eighth Amendment protects convicted inmates. Richko v. Wayne Cty., Mich., 819 F.3d 907, 915 (6th Cir. 2016). Thus, the Sixth Circuit has instructed courts to analyze a pretrial detainee's failure-to-protect claim using the framework set forth in Farmer v. Brennan, 511 U.S. 825 (1994). Id. (citing Ruiz-Bueno v. Scott, 639 F. App'x 354, 358 (6th Cir. 2016)). Under Farmer, an inmate's claim for failing to protect him from violence by other inmates has an objective and subjective component. Bishop v. Hackel, 636 F.3d 757, 766–67 (6th Cir. 2011) (citing Farmer, 511 U.S. at 833). For the objective component, a plaintiff must demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm." Id. at 766 (quoting Farmer, 511 U.S. at 833). For the subjective component, a plaintiff must show that a prison official "kn[ew] of and disregard[ed]" that risk. Id. at 766-67 (quoting Farmer, 511 U.S. at 837).

At least for purposes of this initial review, Plaintiff has satisfied both components of his failure-to-protect claim. He alleges that Abston was unstable, aggressive, and prone to fits of rage, and the Court finds these allegations sufficient to demonstrate that being celled with Abston posed an objectively substantial risk of serious harm to him. As to the subjective component, Plaintiff alleges that he complained verbally to the guards and by messages on the kiosk to the administration at the CCJC, including Sheriff Cox, that he needed to be moved away from Abston,

who was threatening him with violence. (Doc. No. 1 at 10.) Plaintiff alleges that Defendants knew that Abston had been charged with aggravated assault and aggravated animal cruelty, and that he was a mental health patient. (Id. at 11.) He alleges that, despite this knowledge and Plaintiff's complaints that Abston had threatened him and extorted money and commissary items from him, Defendants declined to move him away from Abston, citing overcrowding at the CCJC. (Id.)

These allegations are sufficient at this stage to state a colorable failure-to-protect claim against Sheriff Cox, Capt. Claflin, Lt. Hassler, Sgt. J.R. Hamby, Sgt. Christmas, and Officers Dixon, Aaron Hamby, Mike Hamby, Hurley, and West, who are alleged to have acted pursuant to a CCJC policy or protocol of "refus[ing] to move inmates unless they absolutely have to or are forced to for some reason[.]" (Id. at 12.) In light of this allegation tying the individuals' actions to a policy attributable to Cumberland County,[1] Plaintiff's claim against the County for the failure to protect him from Abston is also sufficiently alleged for purposes of initial review. See Vick v. Core Civic, 329 F. Supp. 3d 426, 445 (M.D. Tenn. 2018) (finding that liability of entity for failure to protect inmate attaches only if entity's policies are shown to be the "moving force" behind inmate's injury) (quoting City of Canton v. Harris, 489 U.S. 378, 389 (1989)).

### b. Deliberate Indifference to Serious Medical Needs

The Fourteenth Amendment also provides the basis for pretrial detainees to assert a Section 1983 claim of deliberate indifference to serious medical needs. Winkler v. Madison Cty., 893 F.3d 877, 890 (6th Cir. 2018) (quoting Phillips v. Roane Cty., 534 F.3d 531, 539 (6th Cir. 2008)). This claim is also comprised of an objective and a subjective component. "The objective component requires the plaintiff to show that the medical need at issue is 'sufficiently serious.'" Richmond v.

---

[1] Policies in place at the CCJC are attributable to Cumberland County, the entity responsible for operating that facility. Cofer v. Cumberland Cty. Sheriff's Dep't Med. Staff, No. 2:10-cv-00059, 2010 WL 3238308, at *2 (M.D. Tenn. Aug. 13, 2010).

Huq, 885 F.3d 928, 938 (6th Cir. 2018) (quoting Farmer, 511 U.S. at 834). To satisfy the subjective component, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." Id. at 939 (quoting Farmer, 511 U.S. at 837).

Presuming the truth of Plaintiff's allegation that he was diagnosed with a broken eye socket, a broken sinus cavity, and a fractured rib as a result of Abston's attack (Doc. No. 1 at 13), the need for medical treatment of these injuries was sufficiently serious. "[W]hen an inmate had a medical need diagnosed by a physician as mandating treatment, the plaintiff can establish the objective component by showing that the prison failed to provide treatment, or that it provided treatment so cursory as to amount to no treatment at all." Rhinehart v. Scutt, 894 F.3d 721, 737 (6th Cir. 2018) (citations and internal quotation marks omitted). Plaintiff alleges that while he was seen in the medical department with some frequency, his report of "debilitating" and "excruciating" pain in his head and wrist resulted in treatment with only ibuprofen and ice packs, rather than the medications that he had been prescribed by the emergency room physician or the further diagnostic tests recommended by Dr. Bise. (Doc. No. 1 at 14, 15–17.) The Court finds that Plaintiff has sufficiently alleged that he received "treatment so cursory as to amount to no treatment at all," and therefore has established the objective component of his claim for purposes of initial review.

Regarding the subjective component, Plaintiff alleges that the treatment decisions of his CCJC medical providers were driven by cost concerns and the need to restrain Cumberland County's spending on inmates' medical treatments. (Doc. No. 1 at 14–17.) These decisions were alleged to be based on "new policies put into place by Sheriff Casey Cox & Captain Tim Claflin that were supposed to ensure that C.C.J.C. & Q.C.H.C. could and would save Cumberland County

a vast amount of money." (Id. at 17.) Plaintiff specifically alleges that "Jane Doe jail doctor, Jane Doe jail nurse #1, nurse Gabby Starnes, and nurse Jeff Shelton[,] on separate and the same occasions," told him that his left wrist appeared to be injured and perhaps fractured, but because the emergency room had not ordered an x-ray, nothing could be done other than treating the pain and swelling with ibuprofen and ice packs while waiting for it to heal on its own. (Id. at 14.) He further alleges his providers refused to treat his visual symptoms and other complaints associated with his head and neck, stating that "if an inmate wasn't sentenced, and/or the issue wasn't life threatening . . ., the inmate had to either wait to be released, wait to be sent to prison, or have their family pay up front for any dental/medical treatment if the inmate couldn't pay him/herself." (Id. at 16–17.)

These allegations are sufficient at this stage of the proceedings to establish a colorable claim of deliberate indifference to serious medical needs based on policies designed to save money for Cumberland County and QCHC. "A prison doctor's failure to follow an outside specialist's recommendation does not *necessarily* establish inadequate care," Rhinehart, 894 F.3d at 742 (emphasis added), but "[f]ailure by a jail medical staff to adhere to a prescribed course of treatment may satisfy the subjective component" of deliberate indifference. Richmond, 885 F.3d at 939. Moreover, "the Supreme Court [has] specifically indicated that the 'interruption of a prescribed plan of treatment could constitute a constitutional violation.'" Boretti v. Wiscomb, 930 F.2d 1150, 1154 (6th Cir. 1991) (citing Estelle v. Gamble, 429 U.S. 97, 105 (1976)). While further development of the facts may reveal that Defendants provided treatment that was reasonable (if unsatisfactory to Plaintiff) in light of the orders and recommendations of Plaintiff's outside physicians, the allegations are sufficient at this point to colorably claim that these Defendants "consciously expos[ed] [him] to an excessive risk of serious harm" by ignoring these

recommendations for further diagnostic scans and treatment with prescription medications, based on financial considerations. <u>Richmond</u>, 885 F.3d at 940.

Accordingly, Plaintiff's claim of deliberate indifference to serious medical needs will proceed against Cumberland County, QCHC, and Jane Doe jail doctor.[2] This claim will also proceed against Jane Doe jail nurse #1, nurse Gabby Starnes, and nurse Jeff Shelton—the three nurses who are alleged to have denied Plaintiff proper pain medication and care for his wrist, and also to have refused Plaintiff dental treatment (Doc. No. 1 at 18) as well as treatment for symptoms of an STD, which they did not allow him to present to the jail doctor. (<u>Id.</u> at 16, 27.)

While Plaintiff also claims deliberate indifference on the part of guards Claflin, Hassler, J.R. Hamby, and Christmas, he does not allege that these Defendants obstructed his access to treatment, but only that they told him to take his complaints to the medical department. Therefore, the deliberate indifference claim will not proceed against these guards, nor against Jane Doe jail nurse #2, who is merely alleged to have heard Plaintiff's complaints of symptoms related to his injuries but deferred to the jail doctor's decision on Plaintiff's further treatment. (<u>Id.</u> at 14, 16.)

### c. First Amendment Claims

In addition to his claims for deliberate indifference to his safety and medical needs, Plaintiff claims a First Amendment violation. (Doc. No. 1 at 9.) In support of this claim, Plaintiff alleges that although he was initially denied phone, library, church, and commissary privileges for disciplinary reasons (Doc. No. 1 at 19–21), the denial of privileges continued when he was moved to a men's housing pod where the guards were allowed to run the pod "the way they saw fit." (<u>Id.</u>

---

[2]     Although designation of "John Doe" or "Jane Doe" defendants is not favored, it is permissible when the defendants' identities are not known at the time the complaint is filed, but may be determined through discovery. <u>See</u> <u>Berndt v. Tennessee</u>, 796 F.2d 879, 882–84 (6th Cir. 1986). The Court deems it reasonably likely that the identities of "Jane Doe jail doctor" and "Jane Doe jail nurse #1" will be determined during discovery.

at 25.) While housed in this pod, Plaintiff was not provided with cleaning supplies; was not allowed recreation time or time to call his family after 9:00 a.m.; was deprived of regular shower time; and, was denied the ability to use the library or attend church services. (<u>Id.</u> at 22.) He was also denied all requests for a Bible, as well as attempts by family members and a visiting minister to deliver a Bible to him. (<u>Id.</u> at 22–23.) Plaintiff was denied these privileges, and also experienced issues with his personal and legal mail being opened outside his presence or not delivered to him, between mid-October and November 22, 2018. (<u>Id.</u> at 22–26.) Plaintiff was told that his privileges were restricted because he was classified as a "medical" inmate (<u>id.</u> at 20, 21), and that his mail issues resulted from the mistakes of newly hired guards who had not been properly trained. (<u>Id.</u> at 25.)

Plaintiff alleges that he "continued to put in on the kiosk all these things even though [he] was told by the correctional staff that it wouldn't do [him] any good, and even though [he] was told numerous times that there was not a grievance procedure at the C.C.J.C." and "was always denied when [he] would ask for grievance forms." (<u>Id.</u>) He further explains his attempts to grieve his loss of privileges and the response to those attempts as follows:

> I was told by the correctional staff of C.C.J.C. that if I wanted to grieve something that I would have to write Nashville, Tn. . . . I was also told on one occasion by Captain Tim Claflin & Lt. Mike Hassler, that they allowed the guards in men's housing, who ran the men's housing control tower, run . . . men's housing the way they seen fit! I was complaining about the complete loss of my privileges, and the loss of my recreational time. I wrote several & multiple times to Lt. Hassler and Captain Claflin about the . . . loss of all my privileges, but Lt. Hassler's & Captain Claflin's response was that they allowed the guards in men's housing [to] run men's housing the way they saw fit and that none of my rights were or had ever been violated at C.C.J.C. . . . When I would complain about the loss of my privileges, and/or all the cruel treatment I was and had been receiving between 9-18-18 and 11-22-18, I was told on numerous occasions, by multiple guards including but not limited to: Charlie Dixon, Aaron Hamby, Mike Hamby, Justin Hurley, and Chris West that I was not a priority and that the rest of the inmate population came first when it came to rec time, library, church call, and any other privileges.

(<u>Id.</u>)

Although he was told that his loss of privileges was due to his status as a "medical" inmate, Plaintiff claims that these deprivations were the consequence of his complaints during phone calls with family members about his mistreatment at the CCJC, and his expression to them of his interest in consulting an attorney. (Id. at 21–22.) Plaintiff also alleges that he "started to reach out . . . to attorneys," from whom he received return correspondence that was opened outside of his presence. (Id. at 24.) After he complained of the opening of his legal mail, he was told that it was an accident that would not be repeated, but the problem "continued to get worse and worse[.]" (Id.) Although the issue continued to be explained as the result of "new guards being hired and improperly trained," Plaintiff responded to the guards that the opening of his mail "had never been an issue before [he] started to contact attorneys[.]" (Id.)

The Court construes these allegations as supporting a claim of retaliation under the First Amendment. In order to state such a claim, Plaintiff much allege "that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" Hill v. Lappin, 630 F.3d 468, 472 (6th Cir. 2010) (quoting Thaddeus-X v. Blatter, 175 F.3d 378, 394, 398 (6th Cir. 1999) (en banc)). In Hill, the Sixth Circuit reversed the district court's dismissal of a First Amendment retaliation claim on initial screening, emphasizing that the essential elements of such a claim are not overly difficult to establish, "especially in light of the 'indulgent treatment' that '[c]ourts are instructed to give . . . to the 'inartfully pleaded' allegations of pro se prison litigants." Id. at 471 (quoting Pasley v. Conerly, 345 F. App'x 981, 986 (6th Cir. 2009)). The Hill court noted that where the facts alleged in the prisoner's complaint are sufficient to support these elements, the claim should go forward

even though the inmate "fails to explicitly state that he is making a First Amendment retaliation claim," and fails to "make an effective argument for that claim in his . . . complaint." <u>Id.</u>

Here, the complaint contains allegations that are sufficient to state a nonfrivolous claim of First Amendment retaliation, even though Plaintiff does not explicitly claim as much. While Plaintiff's verbal complaints about his treatment at the CCJC did not constitute protected conduct when they were directed to his family members rather than jail authorities, his repeated complaints to Hassler and Claflin, his attempts to file grievances, and his attempts to consult attorneys would be protected speech under the First Amendment. <u>See</u> <u>Horn v. Hunt</u>, No. 2:15-cv-220, 2015 WL 5873290, at *5–6 (S.D. Ohio Oct. 8, 2015) ("[C]ourts have recognized that an inmate's exercise of First Amendment rights is not limited solely to filing grievances or accessing the courts"; "[o]nce a prisoner makes clear his intention to resort to official channels to seek a remedy for ill treatment by a prison employee, retaliation against the petitioner" implicates First Amendment protections.) (citing cases).

As for the element of adverse action, the action taken against the inmate (or the threat of such action) must merely be capable of deterring a person of ordinary firmness from engaging in protected activity; "[a]ctual deterrence need not be shown." <u>Hill</u>, 630 F.3d at 472 (quoting <u>Harbin-Bey v. Rutter</u>, 420 F.3d 571, 579 (6th Cir. 2005)). The ongoing deprivation of privileges Plaintiff alleges, including most prominently the denial of his right to practice his religion, would satisfy the requirement of adverse action capable of deterring continued complaints. <u>See</u> <u>Thaddeus-X</u>, 175 F.3d at 398 (adverse action "threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed").

Finally, Plaintiff's allegations are sufficient at this stage of the proceedings to support the inference that Defendants Claflin, Hassler, Dixon, Aaron Hamby, Mike Hamby, Hurley, and West

allowed these restrictions and the opening of Plaintiff's mail after his transfer to the men's housing pod at least in part because of his complaints, attempts to file grievances, and correspondence with attorneys. In particular, this inference is supported by Plaintiff's allegation that the opening of his mail "had never been an issue before [he] started to contact attorneys," and that he was explicitly told that he would be treated differently from every other CCJC inmate. See Hill, 630 F.3d at 475–76 (retaliatory motive can be supported by circumstantial evidence including "the disparate treatment of similarly situated individuals or the temporal proximity between the prisoner's protected conduct and the official's adverse action"). Plaintiff therefore states a colorable claim of First Amendment retaliation.

In addition, Plaintiff's allegation that he was denied the opportunity to attend church services and all efforts to obtain a Bible or Bible-study materials between mid-October and November 22, 2018, supports a First Amendment claim independent of any retaliatory motive for the denials. "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion," although that right is limited by "the fact of incarceration" and "valid penological objectives." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). "In any free exercise claim, the first question is whether the belief or practice asserted is religious in the [plaintiff's] own scheme of things and is sincerely held." Maye v. Klee, 915 F.3d 1076, 1083 (6th Cir. 2019) (citation and internal quotation marks omitted). Here, given Plaintiff's multiple attempts to secure biblical texts, it is reasonable to infer that his desire for those texts and to attend services was based on his sincerely held religious beliefs. Therefore, the allegation of a total deprivation of religious services and materials over a period of multiple weeks based on Plaintiff's classification as a "medical" inmate is sufficient to allow his First Amendment free-exercise claim (Doc. No. 1 at 9) to proceed against Defendants Claflin, Hassler, Dixon, Aaron

Hamby, Mike Hamby, Hurley, and West. See Maye, 915 F.3d at 1083 (distinguishing cases involving "isolated incident" where inmate missed one weekly religious service from cases where inmate forced to miss multiple religious services or important feast days; finding the latter to support a free-exercise claim).

### 4. Motion to Appoint Counsel

Plaintiff has filed a motion to appoint counsel to represent him in this matter. (Doc. No. 8.) An indigent plaintiff in a civil action, unlike a criminal defendant, has no constitutional right to the appointment of counsel. Lanier v. Bryant, 332 F.3d 999, 1006 (6th Cir. 2003); Lavado v. Keohane, 992 F.2d 601, 605 (6th Cir. 1993). Rather, the appointment of counsel is a "privilege justified only by exceptional circumstances." Lavado, 992 F.2d at 606 (citations omitted). Whether to appoint counsel for an indigent plaintiff in a civil action is a matter within the discretion of the district court. Id. at 604. In making the determination of whether the circumstances warrant the appointment of counsel, courts are to consider the type of case presented and the abilities of the plaintiff to represent himself. Id. at 606 (citations omitted). Evaluation of these factors in turn "generally involves a determination of the complexity of the factual and legal issues involved." Id. (internal quotation marks and citation omitted).

In this case, Plaintiff raises serious claims of deliberate indifference, in support of which he will have to obtain and present medical testimony. He was transferred from the CCJC to a state prison in East Tennessee prior to filing suit. He will therefore need to gather evidence in support of his claims from a jail where he no longer resides and at least one outside medical facility, while also attempting to discover the identity of two "Jane Doe" Defendants. It thus appears that development of the relevant facts will require investigation and discovery beyond Plaintiff's

capability, particularly as he is allegedly continuing to deal with the effects of his injuries. (See Doc. No. 8 at 1.) These circumstances warrant the appointment of counsel in this case.

Plaintiff's motion for appointment of counsel will therefore be granted.

## III. Conclusion

In light of the foregoing, Plaintiff's application to proceed IFP will be granted, and the filing fee will be assessed by separate Order. The following rulings will be made as a result of the screening of the complaint:

(1) Plaintiff's claims against the individual Defendants in their official capacity will be dismissed as redundant of the claims against their employers, Cumberland County and QCHC;

(2) Plaintiff's requests for injunctive relief will be dismissed, and his claim for damages against Abston will be dismissed;

(3) Plaintiff's Fourteenth Amendment claim for failure to protect will be allowed to proceed against Defendants Cumberland County, Sheriff Cox, Capt. Claflin, Lt. Hassler, Sgt. J.R. Hamby, Sgt. Christmas, and Officers Dixon, Aaron Hamby, Mike Hamby, Hurley, and West;

(4) Plaintiff's Fourteenth Amendment claim for deliberate indifference to serious medical needs will be allowed to proceed against Defendants Cumberland County, QCHC, Jane Doe jail doctor, Jane Doe jail nurse #1, nurse Gabby Starnes, and nurse Jeff Shelton, but will be dismissed as against Defendants Claflin, Hassler, J.R. Hamby, Christmas, and Jane Doe jail nurse #2; and

(5) Plaintiff's claims under the First Amendment will be allowed to proceed against Defendants Claflin, Hassler, Dixon, Aaron Hamby, Mike Hamby, Hurley, and West.

Finally, Plaintiff's Motion for Preliminary Injunction will be denied, and his Motion to Appoint Counsel will be granted.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE